RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0043p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

GEORGE G. VENTURA,

        *Plaintiff-Appellant,*

    *v.*

No. 03-3440

THE CINCINNATI ENQUIRER; GANNETT COMPANY, INC.,

        *Defendants-Appellees.*

> 

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 99-00793—Herman J. Weber, District Judge.

Argued: June 15, 2004

Decided and Filed: January 28, 2005

Before: KRUPANSKY,[*] RYAN, and COLE, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Marc D. Mezibov, MEZIBOV & JENKINS, Cincinnati, Ohio, for Appellant. John C. Greiner, GRAYDON, HEAD & RITCHEY, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Marc D. Mezibov, John P. Feldmeier, MEZIBOV & JENKINS, Cincinnati, Ohio, for Appellant. John C. Greiner, John Anthony Flanagan, GRAYDON, HEAD & RITCHEY, Cincinnati, Ohio, Thomas C. Green, Kristin G. Koehler, Mark D. Hopson, SIDLEY, AUSTIN, BROWN & WOOD, Washington, D.C., Robert C. Bernius, NIXON PEABODY LLP, Washington, D.C., for Appellees.

———————————

## OPINION

———————————

PER CURIAM. Plaintiff-appellant George G. Ventura brought this diversity action against *The Cincinnati Enquirer* and its parent company, Gannett Co. (collectively the "Enquirer"), claiming breach of contract, tortuous breach of contract, promissory estoppel, promissory fraud, negligent hiring or supervision, and negligent disclosure. Ventura alleged that the Enquirer disclosed his identity as a news source to a Cincinnati grand jury investigating the illegal news gathering actions of one of the newspaper's former reporters. Specifically, Ventura maintained that he was a

———

[*] The Honorable Robert B. Krupansky, who was a member of the panel, died on November 8, 2004. Prior to his death, he participated in the consideration and decision of this case.

confidential news source assisting former Enquirer reporter Michael Gallagher on a multi-part exposé of the plaintiff's former employer, Chiquita Brands International, Inc. ("Chiquita"). In his role as a news source, Ventura illegally accessed Chiquita's voice-mail system. Ventura claimed that the disclosure of his identity as a news sources breached a confidentiality agreement he had reached with Gallagher. Because Ohio law clearly grants immunity from civil liability for disclosure of information in just such an instance as the matter before us, this court affirms the grant of summary judgment by the district court.

In September 1997, Ventura learned, via the internet, that Gallagher and Cameron McWhirter, reporters on the Enquirer staff, were investigating Chiquita's business practices as background for a series of newspaper articles on the company. In connection with their research, the reporters sought inside information about the company. Ventura volunteered his services to the Enquirer reporters, having left Chiquita's employ thirteen months prior under less than amicable circumstances. Chiquita had employed Ventura as its Senior Legal Counsel in Equador. In early 1996, while acting as Senior Legal Counsel in Honduras, Ventura parted with the company, claiming constructive discharge and discrimination. After his departure, Ventura threatened the company with litigation and demanded a $1.5 million payment to ensure against future legal action and to prevent a letter detailing Chiquita's treatment of minority employees from being released to the press. Ventura supported his claim with transcripts of internal Chiquita voice-mail messages taken from the company's voice-mail system after the plaintiff had separated from the company.[1]

Ventura offered to provide Gallagher with information about Chiquita. However, rather than merely serve as a source of information, Ventura enlisted Gallagher in a scheme to access the Chiquita voice-mail system. Ventura testified that he had cracked the company's password system through random efforts, giving him unauthorized access to individual voice-mail message boxes. According to the record, Ventura encouraged the reporters to listen to these messages and provided the passwords to Gallagher who incorporated the stolen voice messages into articles he wrote for publication.

Prior to their activity, Gallagher and Ventura had entered into a mutual agreement that Ventura would be treated as a confidential source, and that his role in providing the voice-mail codes would remain undisclosed. Ventura, however, did not expect the reporters to hide the fact that he had spoken with them. Indeed, Ventura himself told Chiquita that he was speaking with Gallagher, in an apparent effort to convince Chiquita that he was not a confidential source. In his testimony, Ventura admitted that:

> [The Enquirer] could use my name always honoring the commitment that they had made, not informing anybody that I was a confidential source, keeping me otherwise anonymous. They could use my name . . . but not breaching their agreement with me to keep me – to keep me confidential and anonymous as a confidential source.

On May 3, 1998, the Enquirer published the first of a series of articles critical of Chiquita using excerpts from the company's voice-mail messages. Chiquita notified law enforcement officials regarding the unauthorized use of the voice-mail and identified Ventura as a principal suspect. After the Court of Common Pleas appointed a Special Prosecutor, Chiquita provided investigators with Ventura's threatened press release and the voice-mail transcripts that had accompanied plaintiff's 1996 litigation letter. Chiquita also reported that Ventura had admitted speaking with Gallagher. Finally, a few weeks after the initial publication of the Enquirer articles, Chiquita demonstrated to the newspaper that Gallagher had illegally invaded the voice-mail system.

---

[1] In his deposition, Ventura denied stealing voice-mail messages in 1996, claiming that he received the transcripts in an anonymous mailing. Nevertheless, by 1996, Chiquita knew that Ventura was gaining access to voice mailboxes of employees at a time when such access was not authorized.

As a result of these revelations, the Enquirer fired Gallagher on June 26, 1998, and demanded, both orally and in writing, that he return all Enquirer property in his possession including files, tape recordings, and notes. The Enquirer also publicly apologized for Gallagher's misconduct and paid Chiquita more than $10 million in a settlement.

A mere three hours after the Enquirer fired Gallagher, a Cincinnati grand jury subpoenaed the reporter, requiring him to produce all materials related to Chiquita in his custody or control. Gallagher moved to quash the subpoena and the court placed the reporter's materials under seal. Nearly a month later, the grand jury subpoenaed Gallagher's home computer, from which prosecutors recovered incriminating e-mail messages from Ventura which Gallagher thought he had deleted.

On September 10, 1998, as part of a plea agreement, Gallagher proffered his own testimony and released the sealed materials to the grand jury. Those materials included tape recordings of telephone conversations with Ventura regarding Chiquita's voice-mail system. The evidence obtained from Chiquita and from Gallagher led to Ventura's indictment on September 16, 1998.

Ventura pled no contest, was convicted of multiple counts of Attempted Unauthorized Access to a Computer System, and was placed on probation for two years. The state of Utah, where Ventura was a member of a law firm, as well as the District of Columbia, suspended him from practice based on the Ohio criminal conviction.

In the instant matter, the district court granted the Enquirer's motion for summary judgment, finding no factual evidence to support Ventura's allegation that the Enquirer had broken a promise to protect his identity. The district court also determined that summary judgment was proper because Ohio law granted "immunity from civil liability for disclosure of information . . . to the prosecuting attorney and/or the grand jury." The district court concluded that witnesses in criminal cases are cloaked with an absolute privilege which "'encourage[s] the reporting of criminal activity by removing any threat of reprisal in the form of civil liability' and 'aid[s] in the proper investigation of criminal activity and those responsible for crime.'" (*Quoting M.J. DiCorpo, Inc. v. Sweeney*, 634 N.E. 2d 203, 209 (Ohio 1994)). The district court held that the privilege barred all of Ventura's claims, as a matter of law. In response, the plaintiff filed this timely notice of appeal.

This court reviews the district court's grant of summary judgment *de novo*. *Smoot v. United Transp. Union,* 246 F.3d 633, 649 (6th Cir. 2001). Additionally, this court reviews the denial of a motion to compel for an abuse of discretion. *Lavado v. Keohane,* 992 F.2d 601, 604 (6th Cir.1993) (finding the scope of discovery within the discretion of the trial court). Finally, this court applies the abuse of discretion standard to assess the propriety of assertions of privilege. *United States v. Pugh*, 142 F.3d 438 (6th Cir. Mar. 31, 1998) (unpublished).

Ventura has maintained that he was damaged when the Enquirer improperly disclosed his identity as a confidential source. However, the record evidence does not support this contention.

Instead, the evidence demonstrates that the Enquirer did not disclose the identity of any confidential source. Chiquita confirmed that the Enquirer did not disclose to the company the plaintiff's role as a confidential source. Additionally, when the Enquirer was served with grand jury subpoenas it asserted its Shield Law privilege and established a screening process designed to withhold materials identifying confidential sources. Finally, the Special Prosecutor not only confirmed that the Enquirer never produced documents disclosing Ventura's status as a source, but confirmed that no employee of the newspaper identified the plaintiff as a confidential source.

Nevertheless, Ventura has argued on appeal that the Enquirer provided the Special Prosecutor with "Ventura-identifying materials." To this end, the plaintiff has specifically noted the Enquirer's production of a "post-it" note containing the letters "GV" and Ventura's phone number.

Additionally, plaintiff has relied upon deposition testimony from Gallagher to assert that documents, allegedly produced by the Enquirer, "identified him either through fingerprints or other identifying criteria."

None of this material evidence bears on the issue in the instant case:  whether the Enquirer identified Ventura as the confidential source of voice-mail access codes – the grounds for plaintiff's conviction.  First, the Special Prosecutor knew that Ventura had admitted speaking with Gallagher prior to the timely production of the "post-it" note.  The Special Prosecutor testified that he did not intend to offer the note at trial, since it showed only that "it's possible that Gallagher had George Ventura's phone numbers."  Second, Gallagher's deposition testimony stated only that plaintiff's *name* appeared in the documents, and further provided that the documents did not identify Ventura as a confidential source.

Ventura has also maintained that the Enquirer should be vicariously liable for the disclosures that Gallagher made after he was no longer employed by the newspaper.  Specifically, Ventura has forwarded three arguments for the Enquirer's post-employment liability:  the newspaper owed a "special duty" to the plaintiff; the Enquirer had a "special relationship" with Ventura that required it to control Gallagher even after the reporter was fired; and, the newspaper was liable under a theory of "negligent entrustment."

The district court properly concluded that the plaintiff's theories of vicarious liability contained no merit, noting:

> [T]he disclosures leading to plaintiff's criminal indictment and conviction did not occur until after defendants had terminated [Gallagher's] employment.  There is no evidence that Gallagher was authorized to act as defendant's agent at that point.  There is likewise no evidence that defendants used any words or engaged in any conduct which could have created the appearance that Gallagher had the authority to enter into any transaction on behalf of defendants following his termination from employment and to support the imposition of liability on defendants for Gallagher's post-termination disclosures.

The Enquirer released Gallagher from its employ in June 1998.  Three months later, Gallagher tendered evidence to the special prosecutor that led to Ventura's indictment.  Long standing Ohio law indicates that the defendants in the instant matter are not responsible for any allegedly wrongful acts which may have been committed by Gallagher after the newspaper fired him.  *Staten v. Ohio Exterminating Co.*, 704 N.E. 2d 621, 624 (Ohio Ct. App. 1997) (where an ex-employee killed a customer); *Anderson v. Toeppe*, 688 N.E. 2d 538, 544 (Ohio Ct. App. 1996) (where an ex-employee disclosed confidential information); *Evans v. Ohio State Univ.*, 680 N.E.2d 161, 172-73 (Ohio Ct. App. 1996) (where an ex-employee molested a minor).

Nevertheless, Ventura has responded on appeal that "the Enquirer had the right to control Gallagher and the Enquirer property he possessed following his termination," based on a theory of *respondeat superior* and on a theory that the Enquirer owed a "special duty" to the plaintiff.  Yet, neither argument has merit.  First, the doctrine of *respondeat superior* applies only when the employee acts within the scope of his employment, a condition unmet in the instant matter.  *See Strock v. Pressnell*, 527 N.E. 2d 1235, 1244 (Ohio 1988).  Second, the argument that the Enquirer possessed a special duty toward Ventura to control Gallagher after the termination of Gallagher's employment does not comport with Ohio law, where the general rule is that a person has no duty to control the conduct of another person.  *See Gelbman v. Second Nat'l Bank*, 458 N.E. 2d 1262, 1263 (Ohio 1984); *Fed. Steel & Wire Corp. v. Ruhlin Constr. Co.*, 543 N.E.2d 769, 772 (Ohio 1989).  *See also Gilkey v. Gibson*, 2000 WL 4973 at *2 (Ohio Ct. App. Jan 6, 2000) (holding that § 317 of the

Restatement (Torts) is inapplicable to conduct occurring elsewhere than on the employer's premises).

Plaintiff's third contention of vicarious liability rests on the claim that the Enquirer "negligently entrusted" to Gallagher's possession, the documents mentioning Ventura. Again, the plaintiff's argument does not withstand scrutiny.

In Ohio, the doctrine of negligent entrustment applies only to a defendant who entrusts to a third party an inherently dangerous article that causes physical injury to the plaintiff. *See Egbert v. Boweden*, 1995 WL 815478 at *2 (Ohio Ct. App. Dec. 29, 1995) (unpublished). The plaintiff's reliance upon *Tonti v. Paglia*, 172 N.E. 2d 618 (Ohio 1961) and *Williamson v. Eclipse Motor Lines, Inc*., 62 N.E.2d 339 (1945), is simply inapposite, as each claim involved the operation of a motor vehicle that resulted in physical injury.

Ventura has next claimed damages predicated on the presumed breach of a confidentiality agreement with Gallagher that led to plaintiff's indictment. However, Ohio public policy precludes enforcement of agreements to conceal a crime where, as here, the plaintiff is effectively urging the court to enforce an agreement he reached with a co-conspirator to withhold evidence of plaintiff's crimes. It is well settled that reporting criminal activity to a prosecutor is not actionable:

> As a matter of public policy, extension of an absolute privilege under such circumstances will encourage the reporting of criminal activity by removing any threat of reprisal in the form of civil liability. This, in turn, will aid in the proper investigation of criminal activity and the prosecution of those responsible for the crime.

*Di Corpo*, 634 N.E. 2d at 209-10.

The district court properly concluded that "[i]t would not promote Ohio public policy to allow plaintiff to hold defendants liable for failure to exercise their 'privilege' under circumstances where asserting the 'privilege' could shield the commission of a crime." This court confirms that public policy precludes the plaintiff from enforcing any promise by Gallagher to conceal the plaintiff's criminal activity.[2]

Ventura has further contended that even if Gallagher had absolute privilege for statements he made during judicial proceedings, that immunity did not extend to the "documentary or real evidence" that Gallagher released to the grand jury. Plaintiff's argument would unacceptably narrow the judicial proceedings privilege to cover only oral statements, leaving grand jury witnesses unprotected when submitting written evidence. Yet, it is well settled that the judicial proceedings privilege protects against claims of libel. *See Erie County Farmers' Ins. Co. v. Crecelius*, 171 N.E. 97, 98 (Ohio 1930); *Marcum v. Rice*, 1999 WL 513813 at *6 (Ohio Ct. App., Jul 20, 1999) (unpublished).

Ventura has forwarded the additional argument that his criminal indictment and conviction were the direct, immediate and probable consequence of the Enquirer's conduct. Leaving aside the fact that Ventura's conviction was pursuant to a voluntary plea, the plaintiff cannot recover damages

---

[2]Moreover, there is an important distinction between providing evidence of the plaintiff's identity and the central issue in this case, i.e. the disclosure of plaintiff's identity *as a confidential source*. Thus, Gallagher's promise not to disclose Ventura's identity as a confidential source does not mean that he simultaneously guaranteed there would be no evidence of the plaintiff's identity. When Ventura initially contacted the reporters, he created evidentiary tracks of his crimes, including e-mail records and telephone records. Nevertheless, the evidence is uncontradicted that the defendants did not disclose Ventura's identity as a confidential source but instead asserted their journalists' privilege not to disclose.

for injuries proximately caused by his own independent, criminal acts. *See Steele v. Isikoff*, 130 F.Supp. 2d 23 (D.D.C. 2000) (rejecting plaintiff's allegation that a reporter's breach of a promise of confidentiality injured her and concluding that the plaintiff proximately caused her own harm); *Food Lion v. Capital Cities/ABC, Inc.*, 964 F. Supp. 956, 963 (M.D.N.C. 1997), *aff'd in part, rev'd in part on other grounds*, 194 F.3d 505 (4th Cir. 1999) (stating that plaintiff's "practices themselves – not the method by which they were recorded or published" proximately caused damage).

Finally, Ventura has contended that the Enquirer is civilly liable because they failed to intervene in the criminal case against Gallagher. Yet, the Enquirer did not possess the legal grounds to muzzle Gallagher or prevent his cooperation with the Special Prosecutor. Acknowledging such a duty would run up against Ohio's public policy of encouraging the reporting of crime and facilitating the prosecution of those responsible for it. *DiCorpo*, 634 N.E. 2d at 209.

We now turn to the second issue on appeal: Ventura's motion to compel the defendants to answer several deposition questions. The plaintiff has urged this court to find error in the district court's denial of his motion to compel. Specifically, Ventura has maintained that reporters should not be protected from discussing sources whose identities are no longer confidential. Thus, Ventura sought answers to questions about himself. Defendants refused to answer those questions that would elicit privileged source information, invoking the Ohio Shield Law.[3] The magistrate judge and district court ordered the deponents to answer some questions, and sustained the Shield Law objections for a handful of others.

The Ohio Shield Law provides:

> No person engaged in the work of, or connected with, or employed by any newspaper . . . for the purpose of gathering, procuring, compiling, editing, disseminating, or publishing news shall be required to disclose the source of any information procured or obtained by such person in the course of his employment, in any legal proceeding."

Ohio Rev. Code Ann. § 2739.12. The Shield Law protects the press "from disclosing sources of information obtained in the course of employment." *State v. Ventura*, 720 N.E. 2d 1024, 1026 (Ohio C.P. 1999). Section 2739.12 grants reporters and editors an absolute and unqualified privilege. *In re April 7, 1999, Grand Jury Proceedings*, 749 N.E. 2d 325 (Ohio Ct. App. 2000).

The crux of plaintiff's claim is that because his identity as a source was already revealed by defendants, he could no longer be considered a confidential news source and, consequently, defendants could not claim the reporter's shield as codified in § 2739.12.

In diversity cases such as the case *sub judice*, federal courts must apply the state law in accordance with the decisions of the highest state court. *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 517 (6th Cir. 2001). Because the Ohio Supreme Court has not directly addressed the issue this court "must ascertain from all available data, including the decisional law of the state's lower courts, what the state's highest court would decide if faced with the issue." *Id*.

In the state criminal prosecution of Ventura, the Judge properly found that the Ohio Shield Law "does not restrict the scenario to 'confidential' providers of information." *State v. Ventura*, 101 Ohio Misc. 2d 15, 18 (1999). Nor does the statute extend the privilege to the source of the information: "The reporter's shield laws do not prevent disclosure; rather, they permit

---

[3] Ventura specifically sought to compel reporters David Wells and Cameron McWhirter to answer specific questions regarding their relationship with and communications concerning Ventura.

nondisclosure." *Id.  See also In re April 7, 1999 Grand Jury Proceedings*, 140 Ohio App. 3d 755, 757 (2000).

The district court agreed with the magistrate judge's determination that only the newsperson held the privilege.  Because neither of the two reporters that Ventura sought to depose had waived the privilege, the court concluded that nine of the questions were impermissible as either seeking disclosure of the "source of any information" or making the identity of the source "more probable."[4]

The district court did not err in its denial.  Ventura's argument is predicated on the false assumption that he was the only confidential source for the Chiquita story.  If the court had forced the journalist deponents to confirm or deny plaintiff's claim, they would inevitably have revealed information about the existence, or absence, of other unidentified confidential sources.  Forcing a newspaper to disclose information about a self-proclaimed source like Ventura would result in the impermissible likelihood that other confidential sources would be identified.

The district court's discovery order was also proper on grounds of relevance to plaintiff's claims.  Fed. R. Civ. P. 26(b)(1).  While the two reporters refused to entertain certain questions requiring them to identify confidential news sources, they answered all questions about whether they, or anyone else, disclosed the identity of any confidential news source to anyone outside the newsroom.  Yet, the plaintiff's complaint is predicated on the purported *disclosure* of confidential source information and not on the *identity* of any particular confidential source.

For the foregoing reasons, this court **AFFIRMS** the district court's grant of summary judgment and its order denying plaintiff's motion to compel.

---

[4]Some of the questions the court disallowed included the following:
1. Did you ever hear the name George Ventura in connection with the Chiquita story?
2. Did you have any conversations with an individual who identified himself as George Ventura?
3. Do you have any notes which contained the identity of George Ventura?
4. Was the transcript that you saw [of your phone conversations with Ventura] an accurate reflection of a conversation you had?
5. Did you ever discuss with Mr. Wells or [with Enquirer editor] Mr. Beaupre any conversations you had with Mr. Ventura?