NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0029n.06
Filed: January 10, 2006

No. 04-4549

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

RONALD HAIRSTON, )
)
   Plaintiff-Appellant, )
) ON APPEAL FROM THE UNITED
v. ) STATES DISTRICT COURT FOR THE
) NORTHERN DISTRICT OF OHIO
AK STEEL CORPORATION, )
)
   Defendant-Appellee. )

Before: DAUGHTREY, GILMAN and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. Ronald Hairston appeals the district court's summary-judgment ruling in favor of AK Steel Corporation in this employment-discrimination case. Because Hairston has not supported his race-discrimination claim with evidence from which a reasonable jury could conclude that AK Steel's nondiscriminatory reasons for firing him were pretextual, we affirm.

I.

A.

In 1979, Hairston, an African-American, began working as a salaried maintenance-shift manager for Empire Detroit Steel in its Cold Mill plant in Mansfield, Ohio. In September 1999, AK Steel acquired Armco (the successor to Empire Detroit Steel), and in late 2000 it shut down the Cold

Mill plant and transferred Hairston to work in its Caster facility, where he was supervised by Tom

Beres. AK Steel also moved three white production-shift managers from the Cold Mill to the Caster

at the same time that it moved Hairston.

Hairston's reviews at the new location were not as favorable as they had been at the Cold

Mill. His 2000 performance appraisal included a review of the end of his employment at the Cold

Mill and the start of his employment at the Caster. Mark Hoffman, the Caster's department

manager, noted that Hairston overall "did an excellent job in the Cold Mill Maintenance area

thr[ough] October 2000." JA 581. Regarding Hairston's first two months at the Caster, however,

Hoffman concluded that Hairston "needs to increase his personal participation in each of the daily

maintenance job activities." *Id.* Beres echoed the latter comments, telling Hairston that he needed

to be present when the maintenance crews performed repair work.

In August 2001, AK Steel disciplined Hairston for his work on a maintenance procedure

known as a "lockout / tryout." Hairston was in charge of the procedure but was not present at the

time it was performed because he had gone to the health unit for routine blood-pressure testing. The

employee whom Hairston left in charge of the procedure performed it incorrectly, causing a spill of

hydraulic fluid. When Beres questioned Hairston about the incident, he asked Hairston the name

of the employee whose mistake had caused the fluid leak. Hairston responded by asking "why was

it important" and admits he never told Beres the name of the employee despite Beres' repeated

requests for it. JA 431. The on-call associate safety engineer for that day, Mark Kaufman, noted

that "[t]here was a certain uneasiness surrounding the discussion between Tom [Beres] and Ron

[Hairston], in Ron's reluctance to answer Tom's questions quickly," and he thought that Hairston "showed a disrespect for his supervisor." JA 429.

In response to the incident, AK Steel suspended Hairston for 30 days. He received a standard 5-day suspension for the safety violation and a 25-day suspension for insubordination because he refused to answer Beres' question. General Manager Kirk Reich found that Hairston was "uncooperative, evasive and inconsistent when [Reich] questioned [Hairston] about the incident," JA 139, and noted that "[n]o other manager engaged in similar conduct" while Reich was general manager, *id.*

Matters did not improve when Hairston returned from the suspension. Beres and other AK Steel employees held counseling sessions and took other steps to discuss Hairston's performance problems with him on several occasions over the next year. *See* JA 587 (January 28, 2002 counseling; Kelly Nelson told Hairston that he continued to violate instructions to "report [time] off directly to" Beres; Beres reminded Hairston that he wanted him to "have direct interaction with [his] crew at all times" and personally supervise them instead of "depending upon other managers [] or reports back from the hourly employees"); JA 590 (April 15, 2002 counseling for poor performance; Hairston "was told he was performing below expectations and [that] it was his responsibility to correct his work performance" and was instructed to "communicate clearly and completely with his direct supervisor, Tom Beres"); JA 591 (April 23 and 25, 2002 e-mails from Beres to Hairston detailing deficiencies in Hairston's recent performance).

In Hairston's 2001 performance evaluation, Hoffman and Beres gave him low marks, noting deficiencies in his communication, initiative and knowledge. Hairston's performance was rated as "below satisfactory" in nine out of ten elements and as "unacceptable" in the "job knowledge" element. JA 593. Hairston's "overall performance since being assigned to the Caster . . . approximately 15 months ago," the evaluation noted, "has been less than satisfactory." JA 596. Beres stated that his "high expectations for the shift managers who moved from the Cold Mill to the Caster" caused him to give not just Hairston, but two other white transferees as well, a "2" for their overall 2001 performances.

In May 2002, when Hairston reported for his 3 to 11 p.m. shift, employees at the mill were performing a "scale pump motor change." Soon after Hairston arrived for his shift, the employees asked Hairston to obtain a needed part for the procedure. When Hairston could not locate the part, Beres ordered him to look for it again, and again Hairston could not find it. The parties dispute what happened next. According to Hairston, in response to a further inquiry from Beres, he replied "I can't get any" No. 2 lug connectors. Hairston Br. at 25. According to Beres, in response to the same inquiry, Hairston said "I can't sh[]t [No.] 2 lug connectors." JA 126, 137. Hairston eventually found a different part that could be used for the procedure.

On May 8, 2002, a few days later, Beres and several other managers met with Hairston to discuss the incident. After talking with Hairston, Reich decided to terminate him because "[h]e failed to obtain necessary parts, failed to supervise the job, was disrespectful to his supervisor, and made contradictory statements during the investigation meeting." JA 139. "Mr. Hairston had been

given enough opportunities to improve," Reich added, "and it was not in AK Steel's best interests to retain him as a manager." JA 140. In discharging Hairston, Reich read him a prepared statement, which explained, "As you know, we have had numerous issues with how you have handled work matters culminating with what you did on May 4, 2002. Therefore, I am terminating your employment." JA 426–27.

## B.

On September 5, 2003, Hairston filed a complaint against AK Steel alleging race discrimination in violation of Title VII, 42 U.S.C. § 1981 and Ohio law. After resolving several discovery skirmishes between the parties, the district court granted AK Steel's motion for summary judgment on all of the claims. *See* D. Ct. Op. at 8–9 n.2 (noting that all of Hairston's counts may be addressed together under *Williams v. Ford Motor Co.*, 187 F.3d 533, 538 (6th Cir. 1999) (applying same standards to Title VII and Ohio anti-discrimination claims), and *Evans v. Toys R Us, Inc.*, No. 99-3233, 2000 WL 761803 (6th Cir. June 2, 2000) (applying same pretext analysis to § 1981 and Title VII claims)). On the assumption that Hairston had established a prima facie case of discrimination (because AK Steel replaced him with a white employee), the court determined that Hairston had failed to establish that AK Steel's asserted reason for terminating his employment—that in "his managers' judgment, [Hairston's] performance was poor and he had not responded to their efforts to help him improve"—was a pretext for race discrimination. D. Ct. Op. at 9.

In reaching this conclusion, the court rejected Hairston's argument that AK Steel's explanations for his discharge had no basis in fact. While Hairston asserted "that it was the responsibility of others to find the part" during the May 2002 incident, the court reasoned that Hairston "testified that as shift manager he was responsible for getting the parts for his shift." *Id*. at 11. And while Hairston attempted to establish disputes of fact concerning his behavior during the parts incident (for example, whether he used profanity), the court noted that AK Steel identified other independent reasons for firing Hairston: Hairston had been counseled on other occasions; the managers determined that he had been given sufficient opportunities to improve his performance; and they determined that it was no longer in AK Steel's best interests to retain him as a manager. The factual underpinnings of these independent reasons for discharging Hairston, the court concluded, remained unquestioned, as undisputed evidence showed that Hairston "was repeatedly cited for performance failures" by several supervisors after the Caster transfer. *Id*. at 10.

The court next rejected Hairston's claim that Beres, not he, was the source of the problem, and that Hairston had received better reviews before transferring to the Caster. That a new boss assessed Hairston more critically than his previous supervisors, the court noted, does not by itself advance a claim of race discrimination. And, at any rate, Beres gave several new (white) transferees, not just Hairston, low marks in their first evaluations after being transferred to the Caster. *Id*. at 11–12.

The court then rejected Hairston's argument that "Beres was the impetus behind his termination and that Beres was motivated by discrimination." *Id*. at 12. The district court concluded

that, at most, the summary-judgment record might allow an inference that Beres disliked Hairston, but not that he had "racial animosity" toward him. *See id.* at 13–14 (citing *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 791 (6th Cir. 2000) ("Personal conflict does not equate with discriminatory animus.")). Nor did the district court identify any support in the record for Hairston's claim that Beres treated white employees better than he treated Hairston. The assignment of Hairston to the night shift did not advance this argument, the court reasoned, as Beres made two night-shift assignments (one for Hairston and one for a similarly situated white employee) on the ground that both men were experienced maintenance shift managers and that Beres wished to put employees with less experience on the day shift so that he could work more closely with them. The court likewise held that Hairston did not show that he was disciplined differentially because he did not identify any white employees with similar performance and insubordination problems whom Beres or AK Steel had treated more favorably.

## II.

In this appeal, which we review de novo, *Carter v. Univ. of Toledo*, 349 F.3d 269, 272 (6th Cir. 2003), Hairston claims that he can satisfy all three methods for establishing that AK Steel's nondiscriminatory reasons for terminating him were pretextual: (1) that they had "no basis in fact"; (2) that they "did not actually motivate his discharge"; and (3) that "they were insufficient to motivate his discharge." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). We disagree and adopt the reasoning in Judge Gaughan's thorough summary-judgment opinion because that decision answers most of the objections that Hairston has raised on appeal and

because we can think of no good jurisprudential reason for repeating those answers here. Rather, we will address below the primary argument that Hairston raises on appeal regarding his pretext claim and those arguments that the district court did not address in its summary-judgment opinion.

Hairston principally argues that he established a cognizable claim of pretext, *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000), and that the district court impermissibly weighed evidence and judged the credibility of witnesses in rejecting his claim. But as long as AK Steel had "an honest belief in its proffered nondiscriminatory reason for discharging" Hairston, he "cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). Hairston's theory of discrimination, in other words, must show more than a dispute as to the reasons for the discipline; it must provide evidence from which a jury could conclude "that [AK Steel] did not honestly believe [ ] the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001) (internal quotation omitted).

Attempting to satisfy this requirement, Hairston makes much of two disputes concerning the scale pump motor change operation: whether he used profanity with Beres and whether the need for the part arose prior to Hairston's arrival that day. In doing so, however, he admits that, as a shift manager, he was "responsible for the maintenance work that was done on that shift" and "responsible [for] get[ting] the parts" for his shift. JA 543–44. And he never alleges that the people who fired him, or Beres himself, were aware that another employee might also have been responsible for locating the part before Hairston's shift began. The "particularized facts" before AK

Steel when it decided to fire Hairston, *see Majewski*, 274 F.3d at 1117 (internal quotation omitted), thus are undisputed. Hairston presents no evidence suggesting that Beres did not honestly believe that he heard Hairston swear at him, no evidence that any of the other AK Steel employees who fired him following this incident did not believe Beres' impression of that exchange and no evidence that anyone ever thought that a maintenance-shift manager was not responsible for locating parts needed during his shift.

AK Steel, at any rate, identified reasons apart from the immediate events of that day for firing Hairston. Reich explained that "in my judgment, Mr. Hairston's performance was unacceptable for a manager" because he "failed to supervise the job, was disrespectful to his supervisor, [ ] made contradictory statements during the investigation meeting[,] . . . and in my judgment, . . . had been given enough opportunities to improve and that it was not in AK Steel's best interests to retain him as a manager." JA 139–40. Hairston never attempts to dispute the factual underpinnings of these other explanations for the company's decision. We thus agree with the district court that the undisputed evidence showed that Hairston "was repeatedly cited for performance failures" by numerous supervisors once he transferred to the Caster, D. Ct. Op. at 10, and would add that Hairston does not deny that he continuously received low performance evaluations, required numerous counseling sessions by several supervisors and had been suspended for a prior safety violation, all of which independently support the company's decision.

Hairston also claims that the district court erred in rejecting his motion to compel AK Steel to answer his discovery requests, a contention that we review for an abuse of discretion. *Ventura*

*v. Cincinnati Enquirer*, 396 F.3d 784, 789 (6th Cir. 2005). During discovery, he requested "all documents regarding all other maintenance foremen [and] shift managers/supervisors," JA 54, in order to show that Beres treated Hairston more harshly than similarly situated (white) coworkers. In response, AK Steel limited the material it produced to documents relating to the four other foremen who moved from the Cold Mill to the Caster and began reporting to Beres in 1999 and 2000 because they were the only foremen similarly situated to Hairston. In declining to compel AK Steel to produce the employment records of other foremen, the district court did not abuse its discretion. Once AK Steel became the owner of these steel mills, the undisputed managerial testimony established that "the work culture, operating environment and reporting structure changed dramatically" as the new owner "instituted much more stringent, detailed safety rules and operating procedures" and "required more detailed accounting of the production operations[] and more reporting of items such as productivity figures and safety incidents," as it stressed "manager accountability." *See* D. Ct. Op. at 2 (quoting General Manager Kelly Nelson's deposition). On this record, the district court could reasonably conclude that information about employees who worked for Beres under the previous management were subject to different expectations, that they were not similarly situated to Hairston and that the requested discovery accordingly was too far afield from the issues at hand.

Hairston independently argues that the district court should have compelled AK Steel to produce evidence that would have allowed him to try to make a statistical showing of discrimination. But Hairston's deposition testimony undermines this argument as he testified that it was Beres, and

no one else, who discriminated against him because of his race. *See* JA 558. What is more, before we have allowed claimants to attempt to show discrimination through statistical evidence in the past, we have required the claimant to present threshold evidence regarding the availability of members of the minority class for the relevant position. *See Smith v. Leggette Wire Co.*, 220 F.3d 752, 761–62 (6th Cir. 2000) (collecting cases and holding that statistics are "not admissible [when they do] not establish the number of qualified minorities available in each labor market"). Hairston offered no such information, nor has he explained why the materials he sought from AK Steel were necessary to obtain such evidence. *See* Hairston Br. at 55 (Requests for Production Nos. 43, 44 and 47 all request information about the race of AK Steel's *employees*, not AK Steel's *applicants*). The district court did not abuse its discretion in denying this discovery request.

Hairston alternatively argues that the district court at a minimum should have granted Hairston's request for an order barring AK Steel from using "evidence touching upon the protected documents." Hairston Br. at 57. In addition to the fact that Hairston cites no legal support for this argument, AK Steel submits that it "did not use or rely on any witness whom Mr. Hairston did not depose, or any evidence for the purposes of summary judgment[] that was not produced during discovery," AK Steel Br. at 39, and Hairston does not dispute this statement. Hairston, in short, has not explained how he was prejudiced by the district court's ruling and on this record cannot establish that the district court abused its discretion in making this ruling.

III.

For these reasons, we affirm.